MONROE, Judge.
This is an appeal from a child custody determination.
The record reflects that the parties were married in 1980 and that three children were born of the marriage. On August 19, 1996, the trial court entered a judgment divorcing the parties and establishing child custody. When the judgment was entered, the oldest son, Emmett, Jr., was 14; the daughter, Emily, was 11; and the youngest child, Timmy, was 10. The mother also had two sons *131 bom to her before this marriage: Mario, age 20, and Eric age 24.
The trial court held an ore tenus proceeding, at which it indicated that, after reaching its decision, it would prepare bench notes and forward them to the mother’s attorney so that he could prepare a proposed order. However, the case action summary sheet contains an entry, signed by the trial judge, stating that the notes were prepared and faxed to the father’s attorney so that he could prepare a proposed order. It is not known why the trial court decided to have the father’s attorney, instead of the mother’s attorney, draft the proposed order.
Approximately 20 days after the hearing, the trial court entered an order granting the parties joint legal custody. In the order, the trial court directed that the father would have primary physical custody during the school year and that the mother would have primary physical custody during the summer months. The trial court also ordered the parties to exercise their custodial rights in the family homeplace, meaning that the father would live in the home during the school year and that the mother would live in it during the summer months. The parties were ordered to be responsible for mortgage payments on the homeplace and other household expenses during their custodial months. In addition, the parties were ordered to pay child support during their noncustodial months. According to the order, the “nonphysical custodian shall exercise visitation with the children in accord with Exhibit A which is attached hereto and made a part of this decree.” However, Exhibit A was not attached to the order and was not made a part of the record. The trial court also enjoined the parties from whipping or beating their children and ordered that the mother’s son Mario could not be present in the home while the parties’ children were present. The mother appeals.
Initially, we note that, when a trial court makes a custody determination based on ore tenus evidence, its judgment is entitled to a presumption of correctness and will not be reversed on appeal absent a showing of abuse of discretion or unless the determination is plainly and palpably wrong. Doyle v. Doyle, 621 So.2d 1330 (Ala.Civ.App.1993)
The mother, the father, Emmett, Jr., Emily, and a DHR investigator testified at trial. The testimony of the mother and the father was often inconsistent. The mother testified that she was the parent who took care of the children, making sure they were fed and clothed and taking them to school and church. She also testified that the father, a truck driver, regularly came home from work at 2:00 or 3:00 in the morning and awoke the entire family. She testified that if the dishes had not been cleaned by the time he arrived home, he would throw them in a wheelbarrow and dump them in the yard. In support of her testimony, she presented photographs of dishes, pots, pans, and other similar items that appeared to have been dumped in the yard. The father testified that the mother threw the dishes in the yard. However, both Emmett, Jr., and Emily testified that it was their father who had thrown dishes in the yard, and that he had done so when they had not been washed.
The mother also testified that, on at least one occasion, the father, after arriving home at 2:00 or 3:00 in the morning, woke the children, pulled them out of bed, and whipped them because their rooms were not clean. The mother said that, on the occasions when the father came home angry, he would yell and scream, keeping the family awake until he went to sleep at approximately 5:00 a.m., at which time the mother and children had to begin preparing for school and work. The father admitted that he sometimes woke the mother and children when he came home in the early morning hours, but he denied screaming at them or hitting them, and he testified that he woke the children only if they were sleeping too closely to the fire. However, both Emmett, Jr., and Emily testified that they were often awakened when their father came home, they said, because he would yell at the mother for failing to wash the dishes and to clean and then the mother and father would argue. Emily also testified that, on one such occasion, the father snatched them from their beds and whipped them for having messy rooms. He also ordered them to clean their *132 rooms within 15 minutes. Emmett, Jr., referred to this incident in his testimony as well.
The mother also testified that the father inappropriately disciplined their children by whipping them, often and with great force, with a large, thick belt. She said that he used to whip her two older children, Eric and Mario, after making them pull down their pants and grab their ankles. The father admitted whipping all the children and admitted that he made Eric and Mario grab their knees, but denied making them pull down their pants. Emmett, Jr., testified that the father whipped them with a belt, but that he did not make them pull down their pants. He also testified that their mother whipped them with a belt or a switch, but that their father whipped them more often.
In addition, the mother testified that the father had beaten her for the last 15 years. She said that she had to hit him back sometimes in order to defend herself. The father admitted hitting the mother, but testified that he hit her only in self-defense. Emmett, Jr., testified that he had seen his father hit his mother as often as twice a month. On cross-examination, Emmett, Jr., admitted that he was not sure exactly how many times he had seen his father hit his mother, however, he knew he had seen him hit her more than once. Emily testified that she had seen her father drag her mother out of the house in the middle of the night. The mother also testified that she had to work two jobs (one job being 40 hours a week, and the second job involving only two Friday nights a month) in order to pay for one of her children to attend summer school. She said that the father refused to pay for summer school and did not care if the child had to repeat a grade. The father admitted that the mother probably paid for summer school.
The parties also testified regarding the mother’s son Mario. Mario had been accused by Emily of pulling her by her neck and whipping her. The mother said she did not believe Emily had been pulled by her neck. Both the mother and Emily testified that the mother had sternly reprimanded Mario for whipping Emily and ordered him never to do so again. The mother admitted that Mario had been in trouble with the law and had been sent through a disciplinary “boot camp” program. She testified that she was not responsible for his behavior because he was no longer a minor, although she admitted that he stayed at her home at times. Emmett, Jr., testified that Mario stayed with them most of the time, and Emily testified that Mario was at their home sometimes.
The father also testified that the mother took the children to church with her almost every night. The mother and children testified that they attended church on Sunday, Monday night, Wednesday night, and every other Thursday night. The father felt that the children did not have time to complete their homework because they were in church so often. However, this theory was never substantiated with any other testimony, and it appears that only one child had problems with grades. It also appears that the mother’s church attendance caused tension in the marriage. The father complained that, with the groceries he had purchased, the mother would prepare food to take to church, and that she would feed him only the leftovers. He also said he believed that she would have had time to clean the house properly if she had not been in church so much.
The father also testified that the mother had allowed one of her older sons to drive her car in violation of a court order. He accused her of allowing that son, who was unlicensed, to drive her automobile to Texas, even though the court had ordered the father to provide insurance for the car on the condition that only the mother be allowed to drive it. The testimony regarding whether the father had actually purchased the insurance was disputed, and the father presented no written proof that he had provided the insurance.
A Department of Human Resources (DHR) child abuse investigator testified regarding DHR’s involvement with the Whittle family. She testified that DHR had first been contacted in 1991 regarding alleged physical abuse of Emmett, Jr., by his father. After conducting an investigation, DHR determined that the father had indeed abused his son. DHR was contacted again in 1992 when the mother’s son Mario refused to re *133 turn home because, he said, he was being abused by his stepfather, Mr. Whittle. DHR investigated but, because the alleged abuse had occurred a month before Mario’s complaint, there were no marks on Mario’s body to prove that he had been abused. Therefore, DHR determined, the investigation was inconclusive. DHR was contacted next in 1995, when it was alleged that the children were being left alone overnight. DHR investigated and reprimanded both parties for their behavior, concluding that they were both responsible for ensuring their children’s safety. The mother testified that the children had not been left alone at night since that incident. DHR was contacted several times by the father between July 1995 and March 1996. The investigator said that the father mostly made vague allegations regarding the mother, and that, the investigator felt, he was trying to fabricate a case so that the mother would lose custody of the children. Finally, in March 1996, DHR was informed that the mother might have physically abused the daughter Emily. The complaint was investigated the day the complaint was received, and the investigator determined that Emily had not been abused. She concluded that the mother had whipped Emily with a switch and that the switching left minor marks on Emily’s arm. Emily had been switched for heating a spoon on the eye of the stove and then burning her little brother’s back with the spoon. In conclusion, the DHR investigator testified that she found the mother to be a fit parent.
Both Emmett, Jr., and Emily testified that they wanted to live with their mother and to visit their father.
In making a child custody determination, the trial court should consider the health, safety, and well-being of the children. Smither v. Smither, 579 So.2d 1371 (Ala.Civ. App.1991). Indeed, in child custody cases, the trial court’s paramount concern is for the best interest and welfare of the children. Watson v. Watson, 634 So.2d 589 (Ala.Civ. App.1994). While the children’s preference for a custodial parent is entitled to much weight, it is not controlling on the court’s determination. Sellers v. Sellers, 555 So.2d 1117 (Ala.Civ.App.1989).
Although much of the testimony was disputed, the testimony of Emmett, Jr., and Emily was substantially the same. The trial judge indicated after the children testified that she had no reason to believe that they were not telling the truth. In addition, no party disputed the findings of the DHR investigator. Thus, it appears that the trial court granted custody to the father in spite of the evidence that granting him custody would not be in the best interest of the children. That evidence includes DHR’s finding that he abused Emmett, Jr.; the testimony that he wakes up the family with his screaming when he comes home at 2:00 or 3:00 in the morning; that he once dragged the sleeping children from their beds at around 2:00 or 3:00 a.m. so that he could whip them; and that he had a history of abusing the mother. In addition, the father’s employment requires him to be away from the home until 2:00 to 3:00 in the morning. The father testified that, if he received custody, he would hire a sitter to stay with the children until he got home from work. However, no testimony was offered to show that the proposed sitter was capable, experienced, responsible, or in any way fit to care for the children.
In addition, no credible evidence was presented showing that the mother was not a fit parent. Although she and the father had been reprimanded for leaving the children alone, she testified that she had not left them alone since receiving the reprimand. The father’s complaint regarding her practice of taking the children with her to church 3 to 4 times a week is not well taken. We fail to see how church would have a detrimental effect on the children. Indeed, considering that Emmett, Jr., testified that drug use was prevalent in his community, we believe that the children are probably better off in church. In addition, we note that the children did not complain about their church attendance. Furthermore, the father’s complaints about the mother’s son Mario does not support granting custody to the father during the school year, because the trial court had already remedied their problems with Mario by preventing him from being in
*134 the home while the parties’ children are present.
Because the evidence clearly shows that it is in the best interest of the children for the mother to have custody, we hold that the trial court abused its discretion in awarding primary physical custody to the father during the school year. We must reverse the judgment and remand this case, with instructions for the trial court to enter an order consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
ROBERTSON, P.J., and YATES, and THOMPSON, JJ., concur.
CRAWLEY, J., dissents.